**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| MADE IN DETROIT, INC., | ) | No. 06-457L |
| Plaintiff, | ) | Chief Judge Edward J. Damich |
| v. | ) | Electronically Filed on November 29, 2006 |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**JOINT PRELIMINARY STATUS REPORT**

The parties, by their respective counsel, submit this Joint Preliminary Status Report ("JPSR") pursuant to Appendix A of the Rules of the United States Court of Federal Claims ("RCFC") and the Court's July 18, 2006 Special Procedures Order ("SPO"). The early meeting of counsel was held on November 27, 2006 and attended by lead counsel for the parties.

A. JURISDICTION

The parties agree that the Tucker Act, 28 U.S.C. § 1491, confers jurisdiction on this Court to adjudicate a claim of a Fifth Amendment taking.

B. CONSOLIDATION

The parties agree that this case should not be consolidated with any other case.

C. BIFURCATION

The parties agree that the trial should not be bifurcated. It is Defendant's position that economic impact is relevant to liability under the three-part test outlined in Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978).

D. TRANSFER OR DEFERRAL OF PROCEEDINGS

The parties agree that this case should not be transferred or deferred pending consideration of another case before this Court or any other tribunal. Although the property at issue has been subject of previous litigation in federal and state court, none of those cases is currently pending.

E. REMAND OR SUSPENSION

The parties will not seek remand or suspension.

F. ADDITIONAL PARTIES

The parties do not intend to join additional parties.

G. MOTIONS

The parties do not currently intend to file any motions pursuant to Rules 12(b), 12(c) or 56 of the Court of Federal Claims. Defendant anticipates that it will file a dispositive motion at the close of discovery. Plaintiff may also file a dispositive motion at the close of discovery.

H. RELEVANT FACTUAL AND LEGAL ISSUES

*Plaintiff's Statement*

(1) On December 31, 1997, Made In Detroit ("MID") purchased approximately 410 acres of property (hereinafter "MID property") and intended to develop a mixed-use commercial, recreational, and residential project. The MID development plans included

the construction of a bridge from its mainland property to an island upon which some of the homes would be constructed. Different federal officials indicated early opposition to the project and actively worked to find support to deny any development on the property, and thus guarantee ultimate preservation of the property.

(2) On March 25, 1998, MID submitted a joint application for a wetland fill permit to the Michigan Development of Environmental Quality (MDEQ) and the Army Corps of Engineers ("ACE"), seeking approval to fill less than 5 acres of wetlands to accommodate its development. MID also submitted plans for the creation of 12.85 acres of wetland to mitigate the proposed filling. On June 9, 1999, the MDEQ and MID agreed upon the issuance of a state wetland permit. The ACE, however, did not rule on MID's application until August 31, 1999, when it denied MID's application. In denying MID's permit application, the ACE noted that its decision was contrary to the decisions of the state and local authorities. The ACE acknowledged that its contrary decision was supported by laws and initiatives intended to preserve and restore the area ecosystem.

(3) Pending the decision by the ACE, MID redesigned its development so that it avoided wetland impact. In short, MID reduced the number of residences in the project and proposed no filling or dredging in any wetland areas. All proposed development would be maintained in upland or otherwise non-jurisdictional areas. Nevertheless, the ACE and the EPA made clear that it was opposed to MID's revised plans and threatened action against MID.

(4) Due to the threats of enforcement against MID by the EPA and the ACE, MID's lenders and financial backers balked at financial commitments to MID to begin work on the revised development plan and placed MID in severe financial jeopardy. In addition,

the municipalities declined to finalize approvals for the new development plans, citing the assertion of jurisdiction by the ACE over the work to be conducted under the revised development plan. In April 2001, the Trust for Public Land ("TPL") approached MID and inquired about purchasing MID's property. The TPL made clear to MID that it could only move forward with a prospective purchase if the United States came up with funding for the property.

(5) As a result of the ACE's and other agencies' interference with MID's plans to develop the upland, and their opposition to the development in general, MID could not obtain construction financing and the financial viability of the project was destroyed. In 2002, the banks began legal steps against the MID property. In October 2002, MID entered Chapter 11 bankruptcy. MID's attempt to develop the property ultimately was thwarted by the government's desire to preserve the property. In 2003, the TPL purchased the property in the Chapter 11 proceeding. The TPL passed a resolution that approved the purchase of the property on the condition that it would turn and sell the property to the United States for preservation. The TPL thereafter resold the property to Defendant pursuant to the Detroit River International Wildlife Refuge Act. The property is now preserved by Defendant as part of the Greater Detroit American Heritage River Initiative.

Legal Issues:

(1) Whether Defendant's conduct resulted in a categorical taking of MID's property under Lucas v South Carolina Coastal Council, 505 US 1003; 112 S Ct 2886 (1992) and its progeny?

(2) Whether Defendant's conduct gives rise to a taking of MID's property under Penn Central Transp Co v New York City, 438 US 104; 98 S Ct 2646 (1978) and its progeny?

(3) Whether Defendant's denial of MID's wetland permit coupled with its indication the ACE might possibly approve some limited development of the property if MID agreed to grant a conservation easement over large portions of its upland property amounts to an unconstitutional taking or exaction under Nollan v California Coastal Comm's, 483 US 825 (1987), Dolan v City of Tigard, 512 US 374 (1994) and its progeny?

(4) Whether Defendant's conduct amounted to an unconstitutional de facto taking of MID's property without full and fair payment of just compensation?

(5) In the event the Court finds that a taking occurred, what is the amount of just compensation due MID including interest, reimbursement of attorney fees and expert costs?

*Defendant's Statement*

Factual Issues:

(1) In December 1997, plaintiff purchased approximately 409 acres located on the Detroit River for $3.1 million. The property – Humbug Marsh – is comprised of uplands, submerged land, and wetlands. In August 1999, the ACE denied plaintiff's application for a Clean Water Act ("CWA") § 404(b) permit to fill wetlands for a proposed residential development because of the adverse environmental and wildlife impacts. An administrative appeal resulted in a remand to the District Engineer for further review. Following remand, the District Engineer issued its final decision, denying the permit application, on June 12, 2000. Plaintiff alleges, *inter alia*, a regulatory taking based on the permit denial.

(2) Plaintiff later filed for protection under Chapter 11 bankruptcy proceedings, which resulted in plaintiff selling the property for $4.8 million to the Trust for Public Land ("TPL") in September 2003. Approximately, a year later the United States Fish & Wildlife Service ("FWS") purchased the property for $4.1 million pursuant to the Detroit River International Wildlife Refuge Act.

(3) In 1990, the ACE denied a prior owner's – Marina Ventures International ("MVI") – CWA § 404(b) permit application to fill wetlands for a residential and retail development on the subject property. Additionally, in 1996 the State of Michigan acquired a conservation easement over Humbug Marsh's wetlands. In July 1996, at a pre-application meeting and before plaintiff purchased Humbug Marsh, the ACE and plaintiff discussed various development constraints such as MVI's earlier § 404(b) permit denial and the wetlands conservation easement.

(4) Defendant submits that the ACE's denial of the permit application did not result in a taking of plaintiff's property. Although plaintiff alleges a categorical taking, a regulatory taking, a taking/exaction, and a de facto taking, given the permit denial and plaintiff's sale of the property for a $1.7 million profit, the appropriate analysis is the Penn Central three-part test. Defendant expects that it will file a dispositive motion at the conclusion of discovery demonstrating that plaintiff cannot establish a taking under the Penn Central factors – economic impact, investment-backed expectations, and character of the government action.

Legal Issues:

(1) Whether the denial of plaintiff's § 404(b) permit application resulted in the unconstitutional taking of plaintiff's property?

(2) In the event the Court finds that a taking occurred, what is the amount of compensation due plaintiff?

I. SETTLEMENT AND ADR

Plaintiff is willing to discuss settlement before the close of discovery and believes that a facilitation process is the most viable option. The United States does not believe that alternative dispute resolution is appropriate at this time; however, following discovery, the United States will reevaluate the possibility of ADR.

J. JOINT PROPOSED SCHEDULING PLAN

**Discovery Plan**

1. The parties request that any hearings be conducted in the National Courts Building in Washington, D.C. Defendant believes this case is likely to be resolved by dispositive motion. Should trial be necessary, the parties anticipate requesting trial in the Federal District Court in Detroit, Michigan because the property and the majority of likely witnesses are local to the area. The parties preliminarily estimate that a trial will last two weeks. The parties agree that they anticipate being prepared for trial within 120 days of the resolution of dispositive motions.

2. The parties do not anticipate joinder of additional parties.

3. As mentioned above, defendant anticipates filing a dispositive motion at the conclusion of discovery demonstrating that plaintiff cannot establish a taking under the Penn Central factors – economic impact, investment-backed

expectations, and character of the government action. Defendant shall file its dispositive motion by **January 15, 2008**. Plaintiff may also file a dispositive motion on or before **January 15, 2008**.

4. The parties do not believe that discovery should be conducted in phases or limited to certain issues.

5. The parties shall complete all fact discovery by **June 1, 2007**.

6. The parties shall disclose their expert witnesses' identities by **May 1, 2007**. Plaintiff's expert reports shall be produced by **July 6, 2007**. Defendant's expert reports shall be produced by **September 7, 2007**. The parties shall make their expert witnesses available for deposition by **October 15, 2007**.

7. The parties shall complete all expert discovery by **November 16, 2007**.

8. The parties anticipate that the standard 25 interrogatories per party should apply in this case. The parties have agreed to allow fifteen depositions per party.

9. The parties do not anticipate requesting physical or mental examinations of parties pursuant to RCFC 35.

K. INITIAL DISCLOSURES

The parties agree to exchange initial disclosures by **December 15, 2006**.

L. PRELIMINARY STATUS CONFERENCE

The parties propose the following time and dates for the preliminary status conference:

a. **December 19, 2006** at 1:00 p.m.

b. **December 20, 2006** at 10:00 a.m.

c. **December 21, 2006** at 10:00 a.m.

M. ELECTRONIC CASE MANAGEMENT

The parties do not believe there are any special issues regarding electronic case management needs in this case.

Counsel for plaintiff has reviewed the content of this report and has authorized counsel for defendant to file this report on behalf of both parties.

DATED: November 29, 2006

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment & Natural Resources Division

/s Steven D. Bryant
STEVEN D. BRYANT
Environment & Natural Resources Division
Natural Resources Section
Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: 202-305-0424
Fax: 202-305-0267
E-mail: steven.bryant@usdoj.gov

OF COUNSEL:

Arvis Freimuts
United States Army Corps of Engineers

Sharon Pudwill
Department of Interior

Richard Clarizio
Environmental Protection Agency