**IN THE UNITED STATES**

**COURT OF FEDERAL CLAIMS**

MADE IN DETROIT, INC.,
A Michigan Corporation

Plaintiff, No.06-457-L

vs.

THE UNITED STATES,

Defendant.

## FIRST AMENDED COMPLAINT

Pursuant to the Court's Order at the Status Conference held on the record on December 20, 2006, Plaintiff, Made In Detroit, Inc., a Michigan Corporation, ("Plaintiff"), by their attorneys Berry Reynolds & Rogowski, PC and Manatt, Phelps & Phillips, LLC, files its First Amended Complaint against Defendant, The United States ("Defendant"), states as follows:

### The Parties

1. Plaintiff, Made in Detroit, Inc, is a Michigan Corporation with its principal place of business located in the City of Detroit, County of Wayne, Michigan.

2. Defendant is the United States, acting through various agencies including, without limitation, the Army Corps of Engineers, the Environmental Protection Agency, the Department of the Interior, the Fish and Wildlife Service and elected and employed individuals.

### Jurisdiction

3. Jurisdiction for this proceeding is based upon the Tucker Act, 28 U.S.C. § 1491(a)(1). Defendant destroyed Plaintiff's fee simple interest in its real property. Plaintiff seeks compensation pursuant to the Fifth Amendment to the United States Constitution.

## General Allegations:

### Proposed Development

4. On December 31, 1997, Made In Detroit ("MID) purchased approximately 410 acres of property (hereinafter "MID property"). The MID property sat adjacent to the Detroit River in the cities of Gibraltar and Trenton and included an island.

5. MID intended to develop a mixed-use commercial, recreational and residential project which included over 300 homes along with a nine-hole golf course. The MID development plans included the construction of a bridge from its mainland property to an island upon which some of the homes would be constructed. The MID project, named "Gibraltar Bay", represented the largest minority owned development project of its kind in the United States.

### Financial and Local Governmental Support

6. Prior to purchasing the property, MID had extensive contacts with financial and local governmental agencies to garner support for the Gibraltar Bay project.

7. The Gibraltar Bay project was located in local municipalities, the cities of Gibraltar and Trenton, which are in Wayne County Michigan, southeast of the City of Detroit. Roughly 90% of the subject property is located in the City of Gibraltar, while the remaining approximately 10% is located in the City of Trenton.

8. MID obtained the early support of these municipalities for the project. Indeed, in July 1997, the City of Trenton passed a resolution requesting the assistance of Wayne County in the acquisition, construction and financing of utilities in conjunction with the Gibraltar Bay project.

9. On November 24, 1997, the City Council of Gibraltar voted to rezone the property located in its jurisdiction from R-1 to PRD, planned residential waterfront development, to allow for the project. The City of Gibraltar also passed a resolution in March 1998 seeking assistance from

Wayne County in the acquisition, construction and financing of utilities in conjunction with the project, and also approve $6,000,000 in bonds for such infrastructure. In a letter dated March 25, 1999, to the Director of the Michigan Department of Environmental Quality, Gibraltar Planning Commission Member James Koerber stated: "Gibraltar needs this property developed for the future of the City."

10. On March 16, 1998, the Trenton City Council voted to rezone the subject property in its jurisdiction from I-3 (heavy industrial) to PD-21 (planned development), and also voted to approve MID's preliminary site plan for the project.

11. MID obtained substantial financial backing for the project. On September 25, 1997, First Chicago NBD Bank issued a financing commitment for the purchase and development of the property.

12. As a result of the development activities of MID, including successfully obtaining local governmental approval for its project, MID greatly enhanced the fair market value of the property.

**The Government's Preservation Activity and Opposition to Development**

13. Also early on in the process of pursuing the Gibraltar Bay project, some federal officials voiced opposition to any development of the property, and instead called for the property to be preserved.

14. Different federal agency officials indicated early opposition to the project and actively worked to find support to deny any development on the property, and thus guarantee ultimate preservation of the property.

15. For example, Dr. Bruce Manny of the U.S. Geological Survey ("U.S.G.S.") office of the Department of Interior actively aided and abetted ardent conservationists opposed to the project,

including providing them with information and meeting directly with opponents of the project in furtherance of their opposition. The U.S.G.S. provided meeting rooms to citizen opposition groups at U.S. government facilities. Dr. Manny later prepared and provided purportedly "objective" information to the Army Corps of Engineers, which it relied upon in denying a permit request by MID. Upon information and belief, Dr. Manny desired to prevent development of the project in order to preserve the subject property. In 1999, MID filed a formal complaint with the Department of Interior alleging a significant conflict of interest by Mr. Manny. The Department of Interior initially informed MID that it opened an investigation of the matter. However, more recently, the Department has claimed no knowledge of the existence of any such complaint.

16. Opposition to the project at times became frenzied. In fact, the opposition even became racially charged with threats being made at individuals associated with MID.

17. In March of 1999, the U.S. Fish and Wildlife Service prepared a document, which supported the acquisition of the MID property by the United States for preservation. The service knew, or reasonably should have known, that MID was not interested in selling its property. Upon information and belief, the Service also recommended to the Army Corps of Engineers that it deny MID's wetland permit.

18. Congressman John Dingell, a high ranking and powerful member of Congress, along with members of his congressional office, expressed opposition to the MID project as well as support for preservation of the property from development. Congressman Dingell apparently hunted the property as a child and had a strong affinity to the property.

19. Congressman Dingell ultimately introduced legislation to create the Detroit River International Wildlife Refuge, which became law in 2001. Upon information and belief,

Congressman Dingell intended the legislation to aid in preserving open space along the Detroit River and to prevent further development, specifically including the property owned by MID.

20. Upon information and belief, Congressman Dingell and/or his staff actively contacted federal agencies, including the Army Corps of Engineers, and assisted opponents to the project in an effort to deny any development of the property.

21. Upon information and belief, Congressman Dingell made contact with one or more of the financial institutions financing the project and encouraged them to support the purchase of the property for preservation.

22. Upon information and belief, another federal employee, Dr. John Hartig, actively worked with conservationists fighting the Made in Detroit project. Dr. Hartig later became the Refuge Manager for the Detroit River International Wildlife Refuge created as a result of Congressman Dingell's legislation, which now includes MID's property subject to this dispute. The Refuge is currently managed by the U.S. Fish and Wildlife Service within the Department of the Interior.

23. Federal agency officials also actively sought out opportunities for preservation of the MID property. As one example, the Environmental Protection Agency commissioned a study entitled Detroit River Candidate Sites for Habitat Protection and Remediation, which, upon information and belief, furthered efforts to target the MID property for preservation. Despite Freedom of Information Act requests for the study, the Department of Interior has refused to produce the study to MID.

24. In another example, federal officials actively sought out partners to assist in preservation of the property. In fact, through these efforts, the Trust for Public Land, a private preservationist non-profit, began to explore preservation of the property acting with the U.S.

government. Upon information and belief, the Trust for Public Land agreed to acquire the MID property upon the condition that it would re-sell the property to the United States government for preservation. The Trust's role was to serve as nothing more than a "middleman" to obtain the property from MID for the government in order to accomplish the government's goal to preserve the property and prevent development of it.

25. The preservation of property for parkland, refuge, or other public purpose serves a legitimate public use.

**Wetland Permit Application**

26. On March 25, 1998, MID submitted a joint application for a wetland fill permit to the Michigan Development of Environmental Quality (MDEQ) and the Army Corps of Engineers ("ACE"), seeking approval to fill less than 5 acres of wetlands to accommodate its development. MID also submitted plans for the creation of 12.85 acres of wetland to mitigate the proposed filling. The then current practice for wetland mitigation in Michigan was a 2 to 1 ratio.

27. The remaining property proposed for development was upland property. The proposed wetland fills were located completely in isolated wetlands located in the upland areas of the mainland portion of the MID property. No filling or dredging was to occur in either the Monguagon or Humbug Marshes, the two coastal wetlands located on the MID property. Nor did MID propose filling or dredging anywhere on the island.

28. The MDEQ and the ACE held a joint public hearing on the wetland permit application on September 15, 1998. The MDEQ initially denied the permit on December 2, 1998. MID altered its development plans and resubmitted the permit application.

29. On May 5, 1999, the MDEQ and ACE conducted a second public hearing on the wetland permit applications. On June 9, 1999, the MDEQ and MID agreed upon the issuance of a state wetland permit. (Exhibit A). The ACE, however did not rule on MID's application until August 31, 1999, when the ACE Detroit District Office denied MID's application.

30. The Detroit District Office informed MID that "there may be a permittable project" if MID agreed to set aside and preserve, without compensation, substantial portions of the upland areas of the property, specifically:

> A permanent conservation easement, including restrictions against any manipulation of soils, vegetation, and hydrology. The easement should provide permanent protection against visual and physical disturbances to wildlife within Humbug Marsh and the lands, which border it. The easement should include all of Humbug Marsh, Monguagon Marsh, Humbug Island, the approximately 4.4 acre triangular area along the north property line, and an upland buffer 150 feet wide, extending from the northwest corner of the parcel along the mainland shore south to the mouth of Handler Drain. The easement would then extend 150 feet on both sides of Handler Drain to the existing pumphouse. From the pumphouse, the easement would extend southerly along the existing contiguous wetlands to the southerly property line. The easement area should be established as a single parcel with no private lots extending into it.

August 31, 1999 correspondence by Lt. Col. Robert J. Davis, U.S. Army District Engineer.

31. MID's property was already burdened by a conservation easement agreed to between the State of Michigan and the prior owner of the property buffering the environmentally sensitive areas of the property and providing for substantial set-backs along the water.

32. The ACE's suggestion for conserving vast additional portions of upland property eliminated any opportunity for waterfront home sites, eliminated the ability to have a nine-hole golf course and golf course home sites, and financially gutted the viability of the project.

33. In denying MID's permit application, the ACE noted that its decision was contrary to the decisions of the state and local authorities. The ACE acknowledged that its

contrary decision was supported by laws and initiatives intended to preserve and restore the area ecosystem.

34. While denying MID's permit application, on April 5, 1999, the ACE Detroit District Office granted a permit to the North End Dredge Committee (Permit No. 98-007-003-0) for the dredging of 10, 403 cubic yards of material from an area of shallows, emergent vegetation, wetlands, and submerged aquatic vegetation from an area of costal wetlands just a few thousands feet away from the MID property, which was also adjacent to the Detroit River.

35. This approval to a non-minority group coupled with the racially charged opposition encountered by MID by citizen groups, led MID to question whether discrimination found its way into the decision-making of the government.

36. On October 28, 1999, MID submitted a Request for Appeal to the ACE's Great Lakes and Ohio River Division (Division Office). On January 28, 2000, MID and the ACE met with the ACE appeals hearings officer pursuant to the ACE's appeal process. The ACE appeal-hearing officer remanded the permit denial decision back to the Detroit District Office, affirming the bases for appeal in some instances and reversing in others.

37. On June 12, 2000, the ACE issued a final denial. (Exhibit B).

**Alteration of MID Development Plan**

38. Pending the decision by the ACE on its wetland fill permit, and in the alternative to filling wetlands under a permit, MID redesigned its development so that it avoided activities that are regulated by the ACE. In short, MID reduced the number of residences in the project and proposed no filling or dredging in any wetland areas. All proposed development would be maintained in upland or otherwise non-jurisdictional areas.

39. The ACE is without jurisdiction to regulate upland areas of property. Further, the ACE's regulations indicate that a permit under Section 404 of the CWA is not required for the placement of pilings, such as those used for the construction of bridges. 33 CFR § 323.3(c)(2). Further, the ACE commissioned a study of the bridge that concluded in 1999 that the proposed bridge would not have any significant harmful impact. At the request of the ACE, the United States Coast Guard, the agency responsible for the permitting of bridges in navigable water, considered whether the planned bridge for the MID development was one that required a federal permit. The Coast Guard determined that there was no federal jurisdiction over the planned bridge.

40. Understanding that without fill or dredging there would be no ACE jurisdiction over any portion of the MID development or that the Coast Guard would have no jurisdiction over the planned bridge, MID redesigned the development so that there would be no fill or dredging required. Instead, regulated wetlands would be avoided by spanning them with small bridges, the footings of which would be placed in upland areas.

41. In April 2000, MID informed the ACE that it intended to begin work on the upland portions of the MID property. In response, the ACE made clear that it was opposed to MID's revised plans and threatened action against MID. The Environmental Protection Agency ("EPA") and the ACE conducted a telephone conference to discuss an "MID enforcement action." The ACE responded to MID's April 10, 2000 letter. In that letter, the ACE claimed that it had "jurisdiction over all work in, over, under or affecting the course, condition or capacity of navigable waters of the United States."

42. In May 2000, the Regional Administrator of the EPA, Francis Lyons, sent a letter to MID's attorney regarding MID's revised plans for development. In the letter, the EPA

threatened MID with fines, penalties and criminal sanctions in the event MID began work on the property and such work was within the EPA's jurisdiction under Section 404 of the CWA. Also in May, EPA staffer, Laura Lodisio, spoke with MDEQ's Director for its Detroit Office, Lynn Buhl, concerning MID's revised development plan. During that discussion, MDEQ indicated that it did not want to take enforcement action again MID, but urged federal authorities to do so if MID began work on the revised development plan. David Ullrich of the EPA responded to Laura Lodisio's email stating that he hoped that MID would not proceed with its revised development plans, but if it did, "we are ready."

43. In June, 2000, the ACE Detroit District Office forwarded correspondence to the Gibraltar City Council outlining what it believed to be its jurisdiction over MID's newly proposed activities.

44. In July 2000, the ACE Detroit District Office wrote to MID noting that it had MID's revised plans. The ACE asserted jurisdiction over proposed borings identified in the revised plan. In addition, it claimed jurisdiction over the proposed bridge, notwithstanding the Coast Guard's determination that it had no jurisdiction because the bridge did not impact navigable waters.

45. The ACE had already issued a permit denial for the project in June 2000, and made clear that it would not consider allowing the construction of the bridge or any development whatsoever on the island property.

46. In July 2000, the ACE informed MID in writing, after reviewing MID's revised development plans, that the "Corps will not accept proposals that are substantively the same as that which has been denied."

**Defendant Acquires the Subject Property**

47. Due to the threats of enforcement against MID by the EPA and the ACE, MID's lenders and financial backers balked at financial commitments to MID to begin work on the revised development plan and placed MID in severe financial jeopardy. In addition, the municipalities declined to finalize approvals for the new development plans, citing the assertion of jurisdiction by the ACE over the work to be conducted under the revised development plan.

48. Upon information and belief, sometime prior to or contemporaneous with these threats, Defendant, through various agents, recruited and/or encouraged the Trust for Public Land, a non-profit land trust, to assist in purchasing the subject property for preservation.

49. In April 2001, the Trust for Public Land approached MID and inquired about purchasing MID's property. The Trust for Public Land made clear to MID that it could only move forward with a prospective purchase if the United States came up with funding for the property. At the time of this communication, no such funding was available.

50. In 2001, MID sought a declaratory judgment and injunction against the United States EPA and the ACE in the United States Federal District Court, Eastern District of Michigan. MID complained that government's purported exercise of jurisdiction and its enforcement threats were preventing MID from obtaining necessary financing and approvals for the project, and was threatening to place MID into bankruptcy.

51. The EPA and ACE moved to dismiss the action arguing that the Court was without jurisdiction because of the Agency's conduct was pre-enforcement and preliminary, and no final action had occurred. The District Court granted the government's motion to dismiss.

52. As a result of the ACE's and other agencies' interference with MID's plans to develop the upland, and their opposition to the development in general, MID could not obtain

construction financing and the financial viability of the project was destroyed. In 2002, the banks began legal steps against the MID property. In October 2002, MID entered Chapter 11 bankruptcy. MID's attempt to develop the property ultimately was thwarted by the government's desire to preserve the property.

53. In 2003, the Trust for Public Land purchased the property in the Chapter 11 proceeding. Upon information and belief, the Trust passed a resolution that approved the purchase of the property on the condition that it would turn and sell the property to the United States for preservation.

54. The Trust for Public Land thereafter resold the property to Defendant. Defendant purchased the property from the Trust pursuant to the Detroit River International Wildlife Refuge Act authored by Congressman Dingell.

55. The property is now preserved by Defendant as part of the Greater Detroit American Heritage River Initiative. Dr. John Hartig, the federal employee who, upon information and belief, actively worked with conservationists in an effort to defeat Plaintiff's project, was appointed as Director of the Greater Detroit American River Initiative.

56. The Defendant and its agents understood or reasonably should have understood that its conduct in opposing development of the uplands on the property and threatening litigation against MID would ultimately result in the loss of financing for the project and the foreclosure and loss of the property itself.

57. The property is now being preserved for the public.

58. MID did not receive full and fair just compensation for the property as required by the Fifth Amendment of the United States Constitution.

**Delay and Futility**

59. The totality of the factual circumstances in this case demonstrates that MID would never have obtained a permit from the Army Corps of Engineers that would have allowed an economically viable use of its property.

60. By way of example, and without limitation, many Federal officials unapologetically supported denial of MID's wetland permit in order to advance the preservation of the entire property from development. The ACE, in part, relied on one or more of these Federal officials actively opposing the project in its determination to deny MID's permit request and oppose development of the upland property. The ACE openly acknowledged that it took into consideration conservation initiatives underway in deciding to deny MID's permit request.

61. Also by way of example, and without limitation, the ACE's refusal to concur in the MDEQ's permit grant, the ACE's citation to reasons for denial of the permit on grounds not within the purview of the Clean Water Act or the agency's jurisdiction thereunder, and its desire to regulate vast amounts of upland outside of its jurisdiction also demonstrate that any attempts by MID to obtain approval from the ACE to make reasonable use of its property was futile.

62. Further, some of the grounds cited by the ACE in support of denying the permit request argue against any development of all or virtually all of the property whatsoever, thus demonstrating the futility of any attempt by MID to obtain approval for any reasonable development of its property.

63. The ACE made clear that it would not even consider MID's revised proposal to develop the property that called for no development in wetland or other regulated areas because it was too similar to MID's permit request that would have disturbed less than five acres of wetlands, while replacing them with over 12 acres of wetlands.

64. Federal officials also understood, or reasonably should have understood, that the delays in the process would themselves lead to the failure of the project. By delaying its approval, denying the permit request, opposing development of the upland property, and threatening litigation against MID for upland development, Defendant undermined and ultimately destroyed the economic feasibility of the project. At the same time, this conduct facilitated the efforts to preserve the entirety of the property, ultimately leading to the passage of federal legislation and the partnering with the TPL that led to Defendant's ownership and preservation of the property.

65. The government's efforts to preserve the property by obtaining ownership of it could only be accomplished by denying any reasonably viable development of the property. Thus, not only were MID's attempts to obtain governmental approval of its development futile, but Defendant's conduct itself was nothing more than a pretext to assist in the ultimate preservation of the subject property. Under the totality of the facts and circumstances underlying this case, any attempt by MID to seek approval from the U.S. government to develop the property was, and would be, futile.

**Count I: Categorical Taking**

66. Plaintiff hereby adopts by reference the allegations contained in paragraphs 1 through 65 as if fully set forth herein.

67. The totality of the conduct of the Defendant leading up to MID's loss of the property through foreclosure and bankruptcy and the Defendant obtaining ownership of the property amounted to a categorical taking of the property by the Defendant.

68. The Defendant's action destroyed all beneficial use of the property by MID.

69. The Defendant now owns the property it intended to preserve, and the property is being preserved for the benefit of the public.

70. The actions of the Defendant give rise to a categorical taking claim under *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886 (1992) and its progeny.

**Count II: Penn Central Taking**

71. Plaintiff hereby adopts by reference the allegations contained in paragraphs 1 through 70 as if fully set forth herein.

72. The Defendant interfered with MID's reasonable investment-backed expectations to develop the upland property into an economically viable project.

73. MID suffered serious financial loss as a result of the Defendant's conduct, including loss of the property itself.

74. The result of the Defendant's interference with MID's legitimate plans to develop the upland property was to preserve the property for the public. As a result, MID was singled out to bear a burden that should be born by the public.

75. Further, and in the alternative, MID was unfairly or disparately treated with respect to the wetlands permitting scheme.

76. The actions of the government give rise to a taking under *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104; 98 S. Ct. 2646 (1978) and its progeny.

**Count III: Taking/Exaction**

77. Plaintiff hereby adopts by reference the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

78. Defendant's denial of MID's wetland permit coupled with its indication the ACE might possibly approve some limited development of the property if MID agreed to grant a

conservation easement over large portions of its upland property amounts to an unconstitutional taking or exaction under *Nollan v California Coastal Comm'n*, 483 U.S. 825 (1987), *Dolan v City of Tigard*, 512 U.S. 374 (1994), and its progeny.

79. There was no essential nexus between the requested permit and the ACE's demand that large portions of the upland be preserved.

80. Even if there were such an essential nexus, which Plaintiff denies, there was no rough proportionality between MID's development proposal and the conditions demanded by the ACE.

81. The ACE demanded that significant and economically critical portions of MID's development proposal contained in non-regulated portions of the property be given to Defendant by way of a conservation easement, without the payment of just compensation.

82. The Defendant's conduct amounted to an unconstitutional taking and/or exaction of Plaintiff's property.

**Count IV: De Facto Taking**

83. Plaintiff hereby adopts by reference the allegations contained in paragraphs 1 through 82 as if fully set forth herein.

84. Defendant desired to acquire and preserve the subject property, and to preclude any development of the subject property. Defendant made good on this intent through the totality of its conduct in, among other things, preventing MID from developing the property, opposing the development both publicly and privately, cooperating with private interests with the like goal of preserving the property, denying MID any reasonable opportunity to develop its property, destroying the economic feasibility of the project, and ultimately acquiring the property for preservation.

85. The Defendant's conduct amounted to an unconstitutional de facto taking of MID's property without full and fair payment of just compensation.

**Relief Requested**

WHEREFORE Plaintiff Made In Detroit, Inc., respectfully requests that the Court enter judgment against the United States for full and fair just compensation due it as a result of Defendant's conduct along with attorney fees and litigation costs as a part of just compensation pursuant to 42 U.S.C. § 4654, compounded interest in accordance with the law, and any such further relief that the Court deems just and proper.

Respectfully submitted,

**MANATT, PHELPS & PHILLIPS, LLP**

By:________________________________

**MANATT, PHELPS & PHILLIPS, LLP**
**HOLLY A. ROTH**
700 12th Street, NW, Suite 1100
Washington, DC 20005
Tel: (202) 585-6552
Fax: (202) 585-6600

**BERRY REYNOLDS & ROGOWSKI, PC**
**DAVID W. BERRY (P25418)**
**RONALD E. REYNOLDS (P40524)**
**JOSEPH M. ROGOWSKI, II (P51316)**
33493 W. 14 Mile Road, Suite 100
Farmington Hills, MI 48331
Tel: (248) 851-3434
Fax: 9248) 851-4743

**Attorneys for Plaintiff**

Dated: January 3, 2007