# MICHIGAN DEPARTMENT OF ENVIRONMENTAL QUALITY
# PERMIT--MODIFIED

Made in Detroit
211 West Fort Street
Suite 2206
Detroit, MI 48220

| | |
|---|---|
| **Permit No.** | 98-10-0328 |
| **Issued** | |
| **Extended** | |
| **Revised** | |
| **Expires** | **December 31, 2004** |

**Under the provisions of the Natural Resources and Environmental Protection Act 451, PA 1994, as amended and specifically:**

☒ **Part 301 Inland Lakes and Streams.**

☐ **Part 325 Great Lakes Submerged Lands**

☒ **Part 303 Wetland Protection**

Permitted Activity: MODIFIED PERMITTED ACTIVITY: Place fill into 2.62 acres for roadway construction. Place fill into 1.86 acres of wetlands for creation of 46 home sites. Construct 15 boardwalks of 1,532 feet in length across the wetlands. Construct approximately 1,000 feet of open pile bridge and place bridge abutments. Place fill into wetlands and bottomlands to create a 600 foot filled causeway approach to the open pile bridge. Construct wetland mitigation areas of approximately 12.5 acres in size. Two (2) of the 12.5 acres of mitigation wetlands shall be contiguous coastal wetlands created from uplands located outside of the existing conservation easement area. Construct 17 stormwater detention ponds approximately 7 acres in size. ALL WORK IS SUBJECT TO THE ATTACHED SPECIFIC PERMIT TERMS AND CONDITIONS.

☐ **Part 31 Floodplain/Water Resources Protection.**

**Permission is hereby granted, based on permittee assurance of adherence to State requirements and permit conditions to:**

**Water Course Affected:** Detroit River
**Property Location:** Wayne County, Gibraltar/Trent, **Section** 25 36
**Subdivision, Lot** **Town/Range** 4S, 10E

**Authority granted by this permit is subject to the following limitations:**

A. Initiation of any work on the permitted project confirms the permittee's acceptance and agreement to comply with all terms and conditions of this permit.
B. The permittee in exercising the authority granted by this permit shall not cause unlawful pollution as defined by Part 31, Floodplain/Water Resources Protection of the Natural Resources and Environmental Protection Act 451, PA 1994, as amended.
C. This permit shall be kept at the site of the work and available for inspection at all times during the duration of the project or until its date of expiration.
D. All work shall be completed in accordance with the plans and the specifications submitted with the application and/or plans and specifications attached hereto.
E. No attempt shall be made by the permittee to forbid the full and free use by the public of public waters at or adjacent to the structure or work approved herein.
F. It is made a requirement of this permit that the permittee give notice to public utilities in accordance with Act 53 of the Public Act of 1974 and comply with each of the requirements of that act.
G. This permit does not convey property rights in either real estate or material, nor does it authorize any injury to private property or invasion of public or private rights, nor does it waive the necessity of seeking federal assent, all local permits or complying with other state statutes.
H. This permit does not prejudice or limit the right of a riparian owner or other person to institute proceedings in any circuit court of this state when necessary to protect his rights.
I. Permittee shall notify the Department of Environmental Quality within one week after the completion of the activity authorized by this permit, by completing and forwarding the attached, preaddressed post card to the office addressed thereon.
. This permit shall not be assigned or transferred without the written approval of the Department of Environmental Quality.
K. Failure to comply with conditions of this permit may subject the permittee to revocation of permit and criminal and/or civil action as cited by the specific State Act, Federal Act and/or Rule under which this permit is granted.
L. Work to be done under authority of this permit is further subject to the following special instructions and specifications:

A. Pre-construction Conditions:

1. Permittee shall submit all required plans and specifications to the Department of Environmental Quality (DEQ) for approval. Permittee shall not implement any regulated construction activities until plans have been submitted and approved by the DEQ. All work shall be conducted in accordance with the final revised plans approved in writing by the DEQ. The required plans shall include:

   a. Detailed construction sequencing and soil erosion and surcharge control measures.

   b. Final design plans and specifications for stormwater detention ponds.

   c. Final design plans and specifications for the causeway, bridge and bridge abutment designs based upon soil bearing capacity and including construction methods and procedures for preventing movement of sediments.

   d. A plan for sediment monitoring, containment, and disposal based on sediment contaminants at the site, causeway, and bridge construction areas, as described in A.8.

   e. Plans and specifications demarcating the development from the conservation easement area, as defined in paragraph A.4.

   f. Restrictive covenants/conservation easement for lots 312-325 limiting land/water interface construction on these lots to placement of only a bulkhead/seawall with toe stone at the shoreline after obtaining any and all necessary permits, as defined in paragraph A.3. No structures, hoists, dredging, docks, piers, or other devices are to be authorized from these lots or riparian interest area.

   g. Final design plans for grading and fill on any lots and parcels with an elevation below the 100 year flood elevation, as described in paragraph A.7.

   h. Final design plans for mitigation as detailed in Mitigation Requirements, paragraph C.1.

   Final design plans and specifications shall be submitted within 180 days of execution of this permit by the DEQ or 180 days following issuance of a permit by the United States Army Corps of Engineers, whichever is later.

   The permittee shall submit the plans and specifications in a phased manner, every 45 to 60 days, and DEQ will respond either by approving the plans and specifications or responding to the plans and specifications within 30 calendar days. In the event the permittee does not phase the plans and specifications to DEQ, DEQ shall approve or respond to the plans and specifications within 60 calendar days.

2. At least 30 days prior to initiation of regulated construction, a preconstruction meeting shall be held with the contractor, permittee or her/his representative, and representatives of the DEQ. To arrange the required meeting contact Mr. Hal Harrington, Land and Water Management Division (LWMD), P.O. Box 30458, Lansing, Michigan 48909, Telephone: 517-373-4608. Permittee shall designate an onsite project

engineer and Point of Contact (POC) responsible to insure compliance with all permit terms and conditions. This POC shall be present at the preconstruction meeting. All items identified in paragraph A1 must be submitted by Made in Detroit to the DEQ at least 15 days prior to the meeting and shall be reviewed at the preconstruction meeting.

3. Prior to initiation of regulated construction activities, permittee shall execute a Conservation-Preservation Easement acceptable to the DEQ restricting dredging, mooring, placement of structures and hoists, and dockage from Lots 312-325 and the riparian interest area located on the easterly side of the island to the eastern boundary of the legal description of the property. The notice of the easement shall be provided to each lot purchaser prior to lot sale and be recorded on each deed for lots 312-325 located on the eastern side of the island. Proposed easement language must be provided to the DEQ for review and approval prior to recording. However, nothing in this paragraph will prevent anyone from applying for a permit in the future for a marina on the southern end of the island that would provide alternative dockage for lot owners on the eastern side of the island with a single point of access to the detroit river.

4. Permittee shall submit and receive written approval for a detailed plan providing for demarcating the existing conservation easement area from the residential development. The plan shall include a four foot high fence or wall of durable and substantial materials for the areas of the conservation easement abutting private homes with openings from each property to the conservation easement, signs demarcating the conservation easement on every other common property line of adjoining homeowners, and the use of natural features and signs for the demarcation of the conservation easement on areas not abutting private homes. Prior to initiation of any regulated construction activity, the fence and signage shall be installed on the mainland. Prior to commencement of any island access work, the fence and signage shall be installed on the island demarcating the easement area. The language on the sign shall be submitted to the DEQ for review and approval. Signs identifying the conservation easement area shall state that an easement to the state of Michigan exists and that the easement area is to remain in its natural, undeveloped state.

5. Permittee shall draft and submit to the DEQ for written approval specific notice language to appear on each deed for lots abutting any conservation easement area which prohibits any alteration of the natural character of the easement area. The notice shall identify the state of Michigan as a proper party capable of initiating legal action to maintain the easement in its natural and undeveloped state. Permittee shall record this DEQ approved language on all deeds abutting the conservation easement area. Permittee shall notify in writing each lot purchaser of the conservation easement before closing.

6. Permittee shall submit a golf course management plan restricting the use of pesticide and fertilizer to the minimum required based on soil conditions.

7. Available information suggests that parts of this development may be in the 100-year floodplain. Any fill, grading, or occupation within the 100-year floodplain will require a permit under the state's Floodplain Regulatory Authority found in Part 31, Water Resources Protection, of the NREPA.

Part 31 of the NREPA provides three options when constructing a residential structure with a basement in an area that has been properly filled above the 100-year floodplain.

a. Elevate the lowest floor, including the basement, above the 100-year floodplain elevation.

b. A licensed professional engineer schooled in the science of soil mechanics must certify that the building site has been filled with soil of a type and in a manner that the hydrostatic pressures are not exerted upon the basement walls or floor while the watercourse is at or above the 100-year floodplain elevation, and that the placement of fill will prevent settling of the building or buckling of floors or walls, and that the building is equipped with a positive means of preventing sewer backup from sewer lines and drains that serve the building.

c. A licensed professional engineer or architect certifies that the basement walls and floors are designed to be watertight and to withstand the hydrostatic pressure from a water level equal to the 100-year flood elevation and that the building is properly anchored or weighted to prevent flotation and is equipped with a positive means of preventing sewer backup from sewer and drains that serve the building.

If lots are filled to elevations above the 100-year floodplain under a Part 31 permit, the applicant will need to apply for a letter of map revision (LOMR) from the Federal Emergency Management Agency (FEMA). The permittee will need as built survey data and plans to show that the ground elevation was filled above the 100-year floodplain elevation.

8. Permittee shall submit a detailed sediment monitoring plan to characterize any contaminants on-site for the DEQ's review and approval. The sediment monitoring plan shall define the extent, nature, and degree of contamination of sediments located on the parcel where construction is proposed and shall, as a minimum, address the proposed causeway and bridge construction areas. The site characterization data resulting from the monitoring will be used to subsequently develop an appropriate containment and disposal plan for non-inert sediments located or moved on the site. Permittee shall submit the results of the sediment monitoring together with the plan for containment and disposal of contaminated sediments to the DEQ for approval. No construction activities on the bridge or causeway shall begin before the DEQ has approved this plan.

B. <u>Construction Conditions</u>:

1. No dredging in the bottomlands or wetlands of the Detroit River is authorized. This provision shall not be construed to prohibit incidental disturbance or removal of sediments associated with construction of the bridge from the mainland to the island as approved by the DEQ pursuant to conditions A.1.C. and A.8. of this permit.

2. All raw areas resulting from this construction activity shall be promptly and effectively stabilized with sod and/or seed-fertilizer-mulch in sufficient quantity to prevent erosion and subsequent siltation to the watercourse.

3. Fill shall consist of clean inert materials which will not cause siltation nor contain soluble chemicals. All fill shall be contained in such a manner as not to erode into any watercourse. All raw banks shall be stabilized with sod and/or seed, fertilizer and mulched or riprapped as necessary to prevent erosion. Any modification or revision to the approved design plans and/or specifications must be approved in writing by the DEQ.

4. Authority granted by this permit does not waive permit requirements under Part 91, Soil Erosion and Sedimentation Control, of the NREPA, being Sections 9101 to 9123, or the need to acquire applicable permits from the authorized public agency pursuant to Part 91.

C. Mitigation Requirements:

1. The authorization granted by the permit for the excavation or placement of fill in the wetland is contingent upon development of a detailed mitigation plan, approval of the plan by DEQ, and implementation of the plan by the permittee, as follows.

   a. The permittee shall develop a detailed plan for the creation or restoration of a minimum of 12.5 acres of palustrine emergent and scrub/shrub wetland to mitigate for the loss of wetlands and wetland benefits as authorized by this permit. A minimum of 2.0 acres of the created or restored wetland shall be coastal wetland directly connected to the waters of the Detroit River, located outside of the conservation easement.

   b. The mitigation plan shall include the following:

      - A site plan showing the location and size of each mitigation site.

      - A grading plan showing existing and final elevations at the site.

      - Typical cross sections through each mitigation site.

      - A description of the type of wetland to be constructed at the site, and anticipated wetland functions and values to be provided by the site.

      - A description of the hydrologic regime for each mitigation site, including a description of the source of water for the site, anticipated water depth, duration of inundation or saturation during the growing season, anticipated water level fluctuations, and discharge point, if any.

      - Detailed construction plans for any water control structures.

      - A description of proposed soil amendments.

      - A planting plan to ensure timely revegetation of the site.

      - A long term management plan for the site, to ensure that wetlands created or restored at the site will be maintained in perpetuity, and will continue to provide wetland benefits as outlined in the plan.

- Performance standards to be used to evaluate successful establishment of wetlands at the site.

- A monitoring plan to be used to evaluate compliance with performance standards, including identification of sampling locations and methods.

c. Construction of the mitigation sites shall not be initiated until the mitigation plan is approved by DEQ.

d. Construction of the mitigation wetlands shall be conducted prior to, or concurrently with grading of the mainland site and functioning as a viable wetland within one year of initiation of regulated construction. There shall be no construction on the bridge or causeway until hydrology is established in the 2.0 acres of created coastal wetland mitigation.

e. Construction of the mitigation sites shall be supervised or overseen by a recognized wetland consultant or authority.

f. Prior to initiation of regulated construction activities, permittee shall prepare for recording by the DEQ an executed Conservation – Preservation Easement for the remaining wetlands on-site and the mitigation wetlands.

g. Final grades of the excavated mitigation area shall provide for inundation or saturation of soils at the ground surface for a sufficient period during the growing season to support the establishment and maintenance of wetland vegetation.

h. Maximum water depth within the mitigation areas shall be 2.5 feet.

i. A layer of peat or suitable wetland soil shall be placed over the entire mitigation area. When inundated or saturated, this material shall have a minimum depth of six inches.

j. Appropriate emergent and scrub/shrub vegetation shall be planted within the mitigation areas within one growing season of completion of final grading.

k. Permittee shall employ construction techniques and best management practices to prevent the introduction and establishment of nuisance wetland plant species including Purple Loosestrife (Lythrum salicaria) and Giant Reed Grass (Phragmites australis).

l. Except as necessary to spot treat nuisance plant species in accordance with (k), no fertilizer, herbicide, insecticide, algicide, rodenticide, fungicide, or other toxic chemical shall be applied to mitigation sites.

m. Mitigation sites shall be protected from discharges of untreated stormwater from the golf course, roadways, or residential areas.

n. Permittee shall be responsible for annual monitoring of the mitigation wetland development for a period of five years or until wetlands meet approved performance standards.

o. Monitoring shall be carried out by a qualified wetland consultant, utilizing recognized and established scientific procedures. The mitigation sites shall be evaluated at least once annually during the growing season. Hydrology shall be measured as often as necessary to determine whether performance standards are met.

1. The annual monitoring report shall include:

   - A measure of the percent cover of wetland species versus upland species.
   - A measure of vegetation diversity.
   - A description of vegetation and animal community structure.
   - A record and description of hydrologic development.
   - A written summary of wetland development, specifically evaluating conformance with approved performance standards.
   - A photographic record of the wetland, with photos taken from the same fixed locations each year.

2. Permittee shall: Should the mitigation wetlands fail to become established after one complete growing season, or fail to satisfactorily progress to a self-sustaining wetland system as designed, the permittee shall:

   - Assess the problem and its probable cause.
   - Develop reasonable and necessary corrective measures as a revision to the original plan.
   - Submit a copy of the proposed corrective measures to DEQ for approval.
   - Complete the corrective measures as approved by DEQ.

3. Reasonable and necessary corrective measures may include but are not limited to re-excavation of the mitigation wetland areas; redesign of water control structures or water supply systems; reseeding or replanting of properly selected wetland plants in all or part of the new wetland communities; addition of organic soil or other soil amendments; or relocation of mitigation areas should the original design fail to provide the water supply needed to maintain wetlands.

p. Permittee shall post a performance bond of not less than $250,000 to insure wetland mitigation is completed per permit terms and conditions unless all mitigation is completed and functioning prior to roadway, golf course, and lot development.

D. General Conditions and Signatures:

1. In issuing this permit, the DEQ has relied on the information and data which the permittee has provided in connection with the permit application. If, subsequent to the issuance of this permit, such information and data prove to be false, incomplete or inaccurate, the DEQ may modify, revoke, or suspend the permit, in whole or in part, in accordance with the new information.

2. Permittee covenants not to sue the state of Michigan, or any of its departments, boards, commissions, officers, employees or agents for any claim whether legal or equitable, arising under, or in any manner related to the privileges granted in this permit. Permittee hereby releases, waives, and discharges the state of Michigan and all of its departments, boards, commissions, officers, employees, and agents from any and all liability to permittee, its officers, employees, and agents, for all losses, injury, or damage to person or property, or death, and any claims or demands therefore, arising under, or in any manner related to, the privileges granted in this permit.

   Permittee covenants and agrees to indemnify and save harmless the state of Michigan, and all of its departments, agencies, boards, commissions, officers, employees, and agents from any and all claims, demands, judgments, and expenses, including attorney fees, for any and all loss, damage, or injury to person or property or death arising under, or in any manner related to (a) this permit, (b) the activities authorized by this permit, or (c) the use or occupancy of the premises that are the subject of this permit

3. This permit does not preclude the need for approvals or permits from other federal, state, county, or municipal authorities as may be required by law. Permittee shall comply with any and all applicable provisions of Part 365, Endangered Species and applicable provisions of the National Historic Preservation Act of 1966 and regulations. This permit does not obviate the requirements of other federal, state, and local laws.

4. This permit does not authorize any construction pads, haul roads, temporary structures, or other structural appurtenances to be placed on or over bottomlands or wetlands. The fills and structures shall not be constructed unless authorized by separate permit or permit revision granted in accordance with applicable law. No fill shall be placed below the 100-year floodplain elevation of 578.1 NGVD without a permit under Part 31 of the Natural Resources and Environmental and Protection Act, 1994 PA 451, as amended (NREPA). Development of the island and mainland will require a Part 31 permit and FEMA revisions to the floodplain map.

5. All slurry resulting from any dewatering operation shall be discharged through a filter bag or pumped to a sump located away from the watercourse and allowed to filter through natural vegetation or gravel filters for a sufficient distance to remove suspended particles.

6. This permit does not authorize or sanction work which may have been previously completed without benefit of permit.

7. Soil Characterization:

   a. All spoils shall be properly characterized and disposed according to statute criteria. If characterization reveals that the spoils are not inert, disposal shall be consistent with Part 115. All spoils excavated from the uplands including organic and inorganic soils, vegetation and debris shall be placed on-site above the ordinary high water mark, leveled, covered with six inches of clean topsoil obtained from off-site, and stabilized with sod, seed, fertilizer and mulch, or paved over in such a manner as not to erode into any waterbody or wetland. This shall be done as soon as feasible upon completion of spoils placement or within a time not greater than three months after spoils placement. Side slopes of cover material shall be no steeper than 3:1 (horizontal:vertical).

   b. Use or placement of the spoils shall be done in such a manner to prevent nuisance conditions and control the release of fugitive dust or visible emissions as required by Part 55, Air Pollution Control, of the NREPA, or the rules promulgated under this Part.

   c. The spoils shall not be mixed with other wastes or materials that are not inert as defined by Part 115, Solid Waste Management, of the NREPA or the rules promulgated under the NREPA.

   d. The provisions of this permit do not preclude the permittee from disposal of the characterized spoils in accordance with Part 115, Solid Waste Management, at a properly licensed Type II solid waste disposal facility or at an out-of-state facility in accordance with the state's solid waste disposal regulations.

THE DEQ HAS MODIFIED THIS PERMIT. FINAL DESIGN PLANS AND DRAWINGS FOR ALL REGULATED CONSTRUCTION WORK MUST BE SUBMITTED FOR DEQ REVIEW AND WRITTEN APPROVAL PRIOR TO THE START OF REGULATED CONSTRUCTION AND WITHIN 180 DAYS OF DEQ EXECUTION OF THIS PERMIT OR 180 DAYS AFTER ISSUANCE OF A PERMIT BY THE U.S. ARMY CORPS OF ENGINEERS. THE PERMIT CONDITIONS REQUIRE SPECIFIC ACTIONS ON YOUR PART TO MAINTAIN COMPLIANCE WITH THIS MODIFIED PERMIT AND THE PERMIT CONDITIONS. SPECIFICALLY, THIS PERMIT REQUIRES DEMARCATION BETWEEN THE DEVELOPMENT AND THE EASEMENT AREA, A CONSERVATION EASEMENT OVER THE RIVER FRONT LOTS, DETAILED PLANS AND SPECIFICATIONS, A CONSERVATION EASEMENT OVER THE MITIGATED WETLANDS AND REMAINING WETLANDS ON-SITE AND OTHER CONDITIONS. THIS PERMIT MUST BE SIGNED AND RETURNED WITHIN 30 DAYS OF RECEIPT TO BE VALID. Other requirements and modifications are included in the terms and conditions of this permit.

Permit No. 98-10-0328

I, Made in Detroit, understand the nature and extent of the MODIFICATIONS to the submitted permit application and agree to comply with the terms and conditions outlined in this MODIFIED permit. By signing this permit, I certify that I have applicable authority on behalf of Made in Detroit to execute this MODIFIED permit and comply with all permit terms, conditions, and requirements.

Gerald E Johnson — June 9, 1999

PERMITTEE FOR CORPORATION DATE

This MODIFIED permit shall become effective on the date of signature by the DEQ officer. Upon signing by the Permittee named herein, this permit must be returned to the LWMD, DEQ, P.O. Box 30458, Lansing, Michigan 48909-7958, for final execution.

Russell J. Harding, Director
Department of Environmental Quality

Richard A. Powers — June 9 1999

By DATE

Richard A. Powers, Chief
Land and Water Management Division

cc: County Department of Public Works
Wayne Drain Commission
U.S. Army Corps of Engineers
Livonia District Office, DEQ

EXHIBIT B
Page 1

**DEPARTMENT OF THE ARMY**
DETROIT DISTRICT, CORPS OF ENGINEERS
BOX 1027
DETROIT, MICHIGAN 48231-1027

August 31, 1999

IN REPLY REFER TO

Executive Office
Regulatory File No. 88-007-079-4

Saulius K. Mikalonis
Agent for Made In Detroit, Inc.
Butzel Long, P.C.
Suite 900
150 West Jefferson
Detroit, Michigan 48226-4430

Dear Mr. Mikalonis:

I reached a decision on the application by Made In Detroit, Inc. (MID) for a Department of the Army permit for discharges of material in the Detroit River and adjacent wetlands in Gibraltar and Trenton, Michigan. After balancing all the reasonably foreseeable benefits and detriments in the overall public interest, I have decided to deny the permit for the project, as proposed.

I realize that your clients have sought to put together a development plan that fits the market and blends into the environment. A former Detroit District Engineer made a prior permit denial decision on this same parcel in 1990. He identified significant impacts associated with development of the island and the shoreline area on the parcel. MID's proposal shares some aspects. However, I have reviewed the current proposal independently of that action. The information which came before me for this decision has further substantiated the importance of the island and the surrounding marshes. MID's project, as currently configured, would have significant adverse impacts on the special characteristics of the project area. These characteristics allow for habitat use by eagles, osprey, and many species of waterfowl and wading birds that are particularly wary of human intrusion at critical times of the year. MID's proposal would have major adverse impacts on fish and wildlife resources, wetlands, conservation, aesthetics, land

use, and recreation. The project's major positive impacts to the economy were outweighed by these and other detriments to the overall public interest.

Our review criteria, primarily the Section 404(b)(1) Guidelines of the Clean Water Act, required us to evaluate secondary impacts to the aquatic ecosystem from discharges associated with the access to the island and development within a 150-foot wide strip of uplands along the marshes. These impacts constitute a significant degradation of the aquatic ecosystem, and this aspect of the project also tipped the balance of the public interest factors cited above toward denial of the application. This impact was so significant that by comparison, filling of other wetlands closer to Jefferson Avenue and within interior areas of the site may be a less damaging alternative.

There may be a permittable project consistent with your goals on this parcel if it contains the following elements:

1. A permanent conservation easement, including restrictions against any manipulation of soils, vegetation, and hydrology. The easement should provide permanent protection against visual and physical disturbances to wildlife within Humbug Marsh and the lands which border it. The easement should include all of Humbug Marsh, Monguagon Marsh, Humbug Island, the approximately 4.5 acre triangular area along the north property line, and an upland buffer 150 feet wide, extending from the northwest corner of the parcel along the mainland shore south to the mouth of Handler Drain. The easement would then extend 150 feet on both sides of Handler Drain to the existing pumphouse. From the pumphouse, the easement would extend southerly along the existing contiguous wetlands to the southerly property line. The easement area should be established as a single parcel with no private lots extending into it.

2. Minimal on-site wetland fills for development of the remainder of the mainland parcel, provided that you propose appropriate compensatory mitigation for those fills which you demonstrate to be unavoidable. The proposed compensatory

mitigation effort should be consolidated so as to maximize replacement wetland functions and values.

I desire to work with you to complete a development that will serve as a model for environmental sustainability in the next millennium. If you wish to do so, please contact my staff. Should you wish to appeal this decision to the Division Engineer at the Great Lakes and Ohio River Division in Cincinnati, Ohio, appeal documents are attached.

Sincerely,

Robert J. Davis
Lieutenant Colonel, U.S. Army
District Engineer

Enclosures

Copy Furnished:

MDEQ, Harrington